TURNER v. WELLS et al.

(Circuit Court of Appeals, Ninth Circuit. January 8, 1917. Rehearing Denied February 13, 1917.)

No. 2798.

1. MINES AND MINERALS ⬤⟿38(17)—ACTION TO DETERMINE AND ESTABLISH RIGHTS—LOCATION BY GRUBSTAKED PROSPECTOR—EVIDENCE.

Declaration of W., a prospector, grubstaked by plaintiff, and accompanied by B., grubstaked by his mother, that "we discovered and located" claims, is insufficient to show that any of the claims located in the names of B. and his mother were discovered and located by W.; not being inconsistent with his having merely assisted B. in locating them.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 103; Dec. Dig. ⬤⟿38(17).]

2. MINES AND MINERALS ⬤⟿99(3)—GRUBSTAKED PROSPECTOR—LOCATION BY PERSON ACCOMPANYING.

That W., a prospector grubstaked by plaintiff, was accompanied by B., grubstaked by his mother, and having an agreement with W. that he should share with W. in any locations made under W.'s grubstake contract, but having no contract with plaintiff, did not prevent B. locating,

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

free of any right of plaintiff, claims discovered by him, though he was assisted by W. in making the locations.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 224; Dec. Dig. ☞99(3).]

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Suit by T. F. Turner against Kate J. Wells and another. From an adverse decree, plaintiff appeals. Affirmed.

This is a suit to recover a two-thirds interest in certain mining claims alleged to have been located under a grubstake contract. The complaint alleged that in March, 1907, the plaintiff, J. F. Creel, and A. W. Wells entered into a contract, under the terms of which the plaintiff and Creel did furnish Wells a prospecting outfit, consisting of a team of mules, wagon, a mining outfit, tools, supplies, provisions, and money, and Wells agreed to furnish his time and labor in prospecting for lodes and mineral deposits, and to locate and record the same in the names of the three parties as equal owners, and that in carrying out said contract Wells did locate certain designated mining claims, upon all of which Wells made the discoveries and wrote the location notices and performed all the preliminary acts of location; that Kate J. Wells, the appellee, was the wife of A. W. Wells, and Burgess Robinson and Harold E. Robinson were her sons, and they were all aware of the grubstake contract; that in pursuance of a conspiracy entered into between A. W. Wells and Mrs. Wells and her sons, for the purpose of defrauding the plaintiff and Creel of their rights under the contract, all said locations were made in the names of Mrs. Wells and her sons, but that this was not known to the plaintiff or Creel until February, 1912, when Wells disclosed the facts to them; that, immediately after ascertaining the facts, the plaintiff, having received an assignment of Creel's interest to himself, brought the suit. The complaint alleged that Kate J. Wells has extracted large quantities of mineral from said claims, to the value of $100,000, and the prayer was that the plaintiff be decreed to own an undivided two-thirds interest in the said claims, that the defendants other than Kate J. Wells be required to state their respective claims or demands to the mining claims, and that Kate J. Wells be required to account for the plaintiff's share of the profits and proceeds of minerals extracted from the mines. The answer of Kate J. Wells and the Ironsides Mining Reduction & Leasing Company denied knowledge of the grubstake contract, and denied that the claims located in the name of Kate J. Wells or Mrs. A. W. Wells and her sons, or any of them, were discovered or located by said A. W. Wells, or that he wrote the location notices thereof, or performed any of the preliminary acts of location, or had the location notices filed of record, and denied any conspiracy or fraud upon the part of Mrs. Wells and her sons, but alleged that all of said mining claims were discovered and located by Burgess Robinson. The court below, upon the pleadings and the evidence, found that the mines were located by Burgess Robinson, that he was not acting under any grubstake agreement with the plaintiff and Creel, and that the fact that he was in company with A. W. Wells would give the grubstakers no interest in the claims so located.

William B. Ogden and Ralph E. Esteb, both of Los Angeles, Cal., for appellant.

S. E. Vermilyea and S. L. Carpenter, both of Los Angeles, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). There are certain facts that are well established by the evidence. First, it

is shown, and it is not disputed, that the appellant and Creel entered into a grubstake contract with A. W. Wells; that Wells stated that he did not wish to go into the mountains alone; and that he wished to take Burgess Robinson, his stepson, with him. For the reason that Burgess was then a minor, the plaintiff and Creel did not include him in the grubstake contract, but it was agreed that Wells was to take Burgess with him on his own account, and to settle with Burgess out of his profits in the grubstake contract. Creel and Wells were to share equally, one-third each. Second, it is shown that all the claims in controversy were located in June, July, and August, in 1907, 'and all of the location certificates, with the exception of two—that of the Iron Max and that of the Golden Rule No. 1—were witnessed by A. W. Wells and were recorded at the request of A. W. Wells. The Iron Max claim was located in the name of Mrs. Wells' two sons. The Beveridge Bell claim and the Kate J. claim were located in the names of Mrs. Kate J. Wells and Burgess. The Catch-em-Mac claim, the Garnet Factor claim, the Golden Rule No. 1 claim, the Golden Rule No. 2, the Golden Rule No. 3, the Grand View claim, the Ironsides claim, and Protection No. 1 claim, were all located in the name of Mrs. A. W. Wells and Burgess. Burgess died in 1908, and A. W. Wells died in September, 1914.

The appellee Kate J. Wells testified that she and her son Burgess were in the mining district in which the claims were located, in 1906 and prior thereto, and that in 1902 she first observed the ground now known as the Ironsides claim, at which time also Burgess was with her; that in the spring of 1907 she furnished supplies to Burgess, aggregating some $340, consisting of money and an outfit of tents, stove, drills, hammers, picks, and everything pertaining to a mining outfit, to go into the district where the claims involved are situated, for the purpose of locating claims; that Burgess wrote her that Wells had told him to go with him;' that she wrote back and told him to have nothing to do with Wells, and not to go with him, and warned him "not to have anything to do with the man"; that Burgess was to do work on certain mining claims not involved in this suit, and also to locate the Ironsides claim, the name of which had been selected by her when she was upon the ground. She further testified that, during the spring and summer of 1907, she never at any time had any conversation or communication with Wells, with regard to his locating claims in her name, and never at any time asked him to locate any claims for her, and that at that time she was not on friendly terms with Wells.

Taking the whole of the testimony as to the relation of Burgess to the locations made in the summer of 1907 to be true, it shows that he was acting in a dual capacity; that, while he was accompanying Wells under an agreement with him by which he was to share with Wells in any locations made under the latter's grubstake contract, he was also acting on behalf of his mother, and with the aid of supplies and outfit furnished by her; and that he had no contractual relation whatever with the appellant and Creel. We have to inquire, therefore,

what evidence there is to show that the claims in controversy were located by Wells on behalf of himself and the plaintiff and Creel, and that they were not located by Burgess on behalf of his mother and himself.

As determinative of this question, the appellant relies upon a letter written by Wells to the appellant on February 11, 1912. In that letter, after reciting the grubstake contract and the relation of Burgess thereto, the writer narrated what he and Burgess did. He wrote that, in the White Mountains, "we discovered and located" in the name of the appellant, Creel, and Wells, certain claims, seven in number (claims not involved in the present controversy); that on certain dates designated "we discovered and located" the claims in controversy; that some time in August Mrs. Wells came to their camp, and was present at the time of the location of the Kate J. claim; "that all claims were located in the names of Kate J. Wells and Burgess Robinson, my name not appearing on any of them; and that, in every instance where the name appears as Mrs. A. W. Wells, I personally wrote the location notice myself." Wells proceeded to state that his letter was written only "with the intent and purpose of putting you in a proper position to secure your rights under the agreement on the hill, to which so far you have been wrongfully detained," and that he would at any time make oath that every word he had written is true, and would appear in any court to testify to the same. It appears, however, that prior to writing that letter, Wells had written a letter to one Wilson, stating that he had paid for Burgess' share of the provisions "out of my own money. He located some very valuable claims, as I will tell later on. The first claim he located he put his name and mine as locators. Then I thought there might be complication with the parties who grubstaked me, and I told him to put my wife's name on the location in place of mine, and the balance of the claims were located in his name and the name of Mrs. A. W. Wells, so my name does not appear on any of the location notices."

[1, 2] Passing by the question whether or not Wells' letter to the appellant was admissible in evidence, and accepting it as evidence of all that it contains, we think it falls short of showing that Wells located any of the claims in controversy. There can be no question but that Burgess, supplied as he was with provisions and outfit by his mother, and acting under her directions, was free, so far as any obligation to Creel and the appellant was concerned, to make locations in his own and his mother's name, and it is not inconsistent with the record to infer that all the claims in controversy were thus discovered and located by him. Wells' letter to the appellant seems to have been written in the belief that all locations made by him or by Burgess were necessarily subject to the grubstake contract, and that belief, we think, accounts for his assumption that the appellant and Creel had been wronged. His statement that "we discovered and located" the claims is not inconsistent with the theory that he assisted Burgess in locating them. The fact that he did so assist Burgess, and wrote the location notices and witnessed and recorded the same, did not of itself subject the locations to the appellant's grubstake contract. We consider

the evidence insufficient to establish any interest of the appellant in the mining claims in controversy.

The decree of the court below is affirmed.

ROSS, Circuit Judge, dissenting.

———————

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes